UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOL BACK,

                              Plaintiff,

          – against –

BANK HAPOALIM, B.M. *and* GIL
KARNI,

                              Defendants.

**OPINION & ORDER**

1:23-cv-02040 (ER)

RAMOS, D.J.:

 Sol Back brings this action against her former employer, Bank Hapoalim, B.M.

("BHI"), and its Chief Executive Officer Gil Karni (collectively, "Defendants"), alleging

that they subjected her to sex-based discrimination and retaliation in violation of federal

and state law.  Doc. 1.  Before the Court is Defendants' motion to dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(6).  Doc. 18.  For the reasons stated below, the

motion is GRANTED.

## I. BACKGROUND

### A.  Factual Background[1]

 Sol Back was hired in 2016 as the executive assistant to the then CEO of the New

York branch of BHI, one of the largest banks in Israel.  Doc. 1 ¶ 19.  Back alleges that she

was subject to occasional sexual harassment in the workplace during her time at BHI.  *Id.*

¶ 40.  As examples, she notes that one unnamed executive offensively touched her fingers

and sent unsolicited flowers, and other senior executives would stare offensively, take her

picture, and comment on her appearance.  *Id.* ¶¶ 40–41.

---

[1] The following facts are based on the allegations in the complaint, which the Court accepts as true for the purposes of the instant motion.  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court also considers documents "incorporated in [the complaint] by reference, and documents integral to it."  *Vogel v. TakeOne Network Corp.*, No. 22 Civ. 3991 (ER), 2023 U.S. Dist. LEXIS 144922, at *10 (S.D.N.Y. Aug. 16, 2023).

Karni was hired as the new CEO in December 2020, and Back continued as his executive assistant.  *Id.* ¶ 29.  Karni was generally polite, but Back alleges he had certain "boorish" behaviors, such as "regularly scratch[ing] his crotch" while standing near her. *Id.* ¶ 38.  Karni would also order Back to set his desk for lunch, and then to clear his dishes when he was finished eating.  *Id.*  Back, who is Jewish, claims that Karni expected her to work into the Sabbath, which begins on Friday evening, and during other Jewish holidays, despite regularly allowing other male colleagues, including two senior vice presidents, to leave or stop working early on Fridays and in advance of Jewish holidays. *Id.* ¶ 39.

In early December, 2021, Karni traveled to Las Vegas and Florida before returning to New York on December 5, 2021.  *Id.* ¶ 46.  Back alleges that Karni was coughing at the office on December 7, and was visibly sick on December 8.  *Id.* ¶¶ 49–50.  On December 8, Back and BHI's Chief Financial Officer, Mark Frucht, advised Karni to go home and get tested for COVID-19, but he declined to do so.  *Id.* ¶ 52.  On December 9, 2021, Karni attended the office holiday party, along with approximately 90 other people.  *Id.* ¶ 54.  That same day, Back went home early after developing a high fever, and tested positive for COVID-19 the following weekend.  *Id.* ¶ 58.  Karni tested positive for COVID-19 on December 12, 2021, and subsequently stayed home for two weeks before returning to the office.  *Id.* ¶ 61.  Approximately 30 other employees tested positive for the virus by December 18.  *Id.* ¶ 64.

Back alleges that five senior male executives—the Head of Food & Beverage and Corporate Banking, the Chief Financial Officer, the Head of U.S. Commercial & Industrial Portfolio Management, the Head of Specialty & Sponsor Finance, and the Head of Structured Finance—complained about Karni's behavior, either to Human Resources or directly to Karni.  *Id.* ¶ 67.  None of these executives were disciplined for their complaints.  *Id.* ¶ 120.  Back filed a formal complaint, in accordance with BHI's whistleblower policy, on December 21, 2021.  *Id.* ¶ 71.  The whistleblower policy stated

that, *inter alia*, "'[c]omplaints will be kept confidential within the legitimate needs of law and any ensuing evaluation or investigation,' that BHI 'does not permit retaliation against an employee, who, in good faith, has made a Complaint,' and that BHI 'shall not discharge, demote, suspend, threaten, harass or in any manner discriminate against an employee in the terms and conditions of employment' as a result of that employee's complaint." *Id.* ¶ 77.  Back's complaint included a timeline of Karni's behavior and alleged symptoms, from December 7, 2021 through the holiday party on December 9, 2021.  *Id.* ¶ 72.

In her complaint, Back wrote that Karni "put the entire company at risk of infection," engaged in "conduct [] in direct violation of policy and guidance that has been promulgated throughout the pandemic and published by the Bank and the Health authorities," "demonstrate[d] complete disregard [for] bank employee[] and [guest] safety," and did so with the "head of HR [remaining] fully aware and staying silent." *Id.* ¶ 73.  Her complaint went on to say that "many employees who got sick [were] expected to continue working from home," and that "employees who sent emails to HR complaining about the conduct were completely ignored at the direction of senior management." *Id.* ¶ 74.  Back was particularly concerned about "HR's failure to respond to [employee] complaints" and of "BHI's inaction in enforcing workplace protocol/policy on Covid." *Id.* ¶ 75.  Finally, Back asked BHI to "act upon this information and take the necessary measures to ensure that no one else experiences the consequences of BHI's inaction." *Id.* ¶ 76.  On December 27, 2021, shortly after Back filed her complaint, BHI changed its whistleblower policy so that complaints no longer went to BHI's chief auditor in Tel Aviv.  *Id.* at 79.  Instead, complaints were directed to Vicki Andreadis, BHI's general counsel, who reported to Karni.  *Id.*

Back claims that she received an excellent employee review in January 2022, which reassured her of her future at BHI.  *Id.* ¶ 80.  Shortly after, in early 2022, Back alleges various changes in her work environment that she believes were connected to her

whistleblower complaint.  *Id.* ¶ 82.  She alleges that Karni's tone towards her became noticeably hostile, and this hostility became characteristic of his attitude towards her.  *Id.* Back also alleges that senior management, with whom she had previously had nearly daily contact, ceased all communications with her.  *Id.* ¶ 83.  On March 3, 2022, BHI's general counsel Vicki Andreadis met with Back to discuss the whistleblower complaint. *Id.* ¶ 84.  Andreadis told Back that the investigation was closed, and that "appropriate actions were taken."  *Id.*  Back expressed concern about Karni's changed behavior, and Andreadis reassured Back that the complaint had been handled in a confidential manner. *Id.*

On March 14, 2022, two BHI executives told Back that Karni had "asked them to reduce their interactions with her."  *Id.* ¶ 87.  On March 17, 2022, Back had her annual bonus review in person with Karni.  *Id.* ¶ 91.  After informing Back that she was receiving a two percent raise and a $15,000 bonus, Karni told her "I don't get what you are doing at your station" and that she was "not doing her job."  *Id.* ¶ 92.  Back claims she was "stunned" by these words, and that they indicated to her, "in no uncertain terms . . . that her job was in danger."  *Id.* ¶ 93.

Back met again with Andreadis on April 5, 2022, and told her she believed Karni had learned about her whistleblower complaint and was retaliating against her.  *Id.* ¶ 96. Andreadis acknowledged that Karni "may have" found out from colleagues in the Tel Aviv headquarters that she had filed the complaint.  *Id.* ¶ 97.  Andreadis went on to propose two possible solutions to Back's concerns:  transferring away from Karni to another department, or taking a severance package.  *Id.* ¶ 98.  Back responded that she had no interest in leaving, even with severance.  *Id.*  She also told Andreadis that she valued her job and would view "any transfer away from the center of power, even for higher pay," as a demotion.  *Id.* ¶ 99.  Back returned to work, and Karni's allegedly hostile behavior continued for months.  *Id.* ¶¶ 102–03.  Back met again with Andreadis on May 31, 2022, and Andreadis asked whether Back had considered the "package

presented" at the last meeting.  *Id.* ¶ 104.  Back reiterated her position that she had done nothing wrong, and neither a severance package nor any transfer would be acceptable. *Id.* ¶ 105.

On June 2, 2022, Back received an email from Andreadis recounting the events of the last few months.  *Id.* ¶ 111.  The email made no mention of the various times Back had voiced concerns about Karni finding out she was the whistleblower, and instead attributed Back's discomfort to "amorphous reasons."  *Id.* ¶ 112.  The email concluded by ordering that Back be transferred to compliance department for a week as a "temporary alternative."  *Id.* ¶115.  Around this same time, in early June, Back underwent a medical procedure that required weeks of recuperation.  *Id.* ¶ 116.  While she was away on sick leave, Back's then attorney[2] sent an email to BHI stating that the June 2 transfer to compliance constituted a constructive termination.  *Id.* ¶ 117.  Back then claims that "[i]n the course of [BHI's] communications with Ms. Back's counsel, BHI officially terminated Ms. Back effective June 21, 2022."  Doc. 1 ¶ 118.  An email supplied by Defendants in support of this motion[3] indicates that BHI reached out to Back on June 21, 2022, to ask if she would be returning to work.  Doc. 20-1 at 2.  Back responded through her Attorney that same day, reiterating the position that Back had been constructively terminated, and instructing BHI to cease direct communication with Back and direct any future correspondence to her attorney's firm.  *Id.*

### B.  Procedural History

Back filed a charge of discrimination with the Equal Opportunity Employment Commission in early November, 2022.  Doc. 1 ¶ 12.  The Commission terminated its

---

[2] The complaint does not indicate when Back retained the lawyer who sent this communication, or when she replaced him with her current attorney.

[3] Because Back relies on the June 21, 2022 correspondence in framing her discharge, the email is integral to this complaint.  *See Vogel*, 2023 U.S. Dist. LEXIS 144922, at *10 ("[T]o be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint.").  When deciding a motion to dismiss, a court may consider exhibits to the complaint, documents incorporated in it by reference, and documents integral to it.  *Id.*  "[C]ommunications whose legal effect forms the basis of a cause of action" may be considered as well.  *Id.* at *11.

investigation of her charge and issued a right to sue notice on January 31, 2023. *Id.*; Doc. 22-1. Back filed this action against BHI and Karni on March 10, 2023. Doc. 1. Back asserts claims of sex discrimination in violation of Title VII of the Civil Rights Act of 1964 against BHI, *Id.* ¶¶ 121–33, and sex discrimination in violation of New York State and New York City Human Rights Laws, as well as retaliation in violation of New York Labor Law, against BHI and Karni, collectively, *Id.* ¶¶ 134–47. On June 30, 2023, Defendants filed the instant motion to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 18.

## II.   LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). However, this requirement does not apply to legal conclusions, bare assertions, or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In order to satisfy the pleading standard set forth in Rule 8, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). Accordingly, a plaintiff is required to support his claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Even though "a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination" to survive a motion to dismiss, "it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 680) (internal alternations omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

## III.    DISCUSSION

As a preliminary matter, Back claims in her opposition to this motion that she alleged she was formally terminated, rather than constructively discharged.[4]  Doc. 21 at 8. However, in her complaint, Back claims that she was constructively discharged on June 2, 2022, Doc. 1 ¶ 117 ("[Back's] position [was] that she was retaliated against and was constructively terminated through the June 2 'transfer' to the Compliance Department."), and then formally terminated on June 21, 2022, *Id.* ¶ 118 ("BHI officially terminated Ms. Back effective June 21, 2022.").  Only one of these claims can be true, because in order to have been constructively discharged, the employee must have resigned.  *Green v. Brennan*, 578 U.S. 547, 555 (2016) (explaining that an employee must show that he "actually resigned" to state a claim of constructive discharge).

A factual concession in a pleading is as judicial admission to which a plaintiff is bound.  *Inn World Report, Inc. v. MB Fin. Bank, NA*, No. 21 Civ. 2911, 2022 U.S. App. LEXIS 35102, at *8 n.3 (2d Cir. Dec. 20, 2022).  Here, Back's complaint explicitly states that she was constructively terminated.  *See* Doc. 1 ¶ 1 ("Plaintiff Sol Back . . . who was constructively terminated from her position . . . .").  Her complaint further states that before BHI supposedly "officially terminated" her, she informed it through her attorney that she believed she had been constructively terminated.  *Id.* ¶ 117 ("[Back's] attorney sent a letter to BHI . . . stating her position that she was retaliated against and was constructively terminated . . . .").  Therefore, Back is bound to the factual concession that she was constructively terminated.

While the complaint does allege that BHI "officially terminated" Back, *id.* ¶ 118, "the Court is not obliged to reconcile and accept as true 'pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference . . . .'"  *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, No. 20 Civ. 4776 (ER), 2022 U.S.

---

[4] To the extent Back is trying to amend her complaint in her opposition papers, this is procedurally improper.  *See Montgomery v. Stanley Black & Decker, Inc.*, 857 F. App'x 46, 48 (2d Cir. 2021) ("[A] party is not *entitled* to amend its complaint through statements made in motion papers.") (citation omitted).

Dist. LEXIS 5817, at *12 (S.D.N.Y. Jan. 11, 2022) (quoting *Xin Wei Lin v. Chinese Staff & Workers' Ass'n*, No. 11 Civ. 3944 (RJS), 2012 U.S. Dist. LEXIS 162768, at *14 (S.D.N.Y. Nov. 8, 2012)).  Back's argument in opposition to this motion that she was "officially terminated," Doc. 21 at 8, is contradicted her other statements in the complaint.  *See* Doc. 1 ¶¶ 1, 117.  It is also contradicted by the email sent by her then attorney to BHI's attorney on that very day.  *See* Doc. 20-1 at 2.  Thus, Back's attempt to characterize the complaint as alleging a formal termination on June 21, 2022 is contradicted by her own previous statements in the complaint and the June 21, 2022 letter from her attorney to BHI.  *Compare* Doc. 1 ¶ 1, *and* Doc. 1 ¶ 117, *and* Doc. 20-1 at 2, *with* Doc. 1 ¶ 118.  The Court will therefore apply a constructive discharge analysis to Back's claims.[5]

### A.  Title VII Claim

To establish a prima facie case of discrimination under Title VII, Back "must show:  (1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). "[A]t the pleadings stage of an employment discrimination case, a plaintiff has a 'minimal burden' of alleging facts 'suggesting an inference of discriminatory motivation.'"  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015)).  A plaintiff therefore must only "plausibly allege that (1) the employer took adverse action against him and (2)

---

[5] To state a claim for constructive discharge, the plaintiff must allege that she quit or resigned her employment.  *Kurian v. Forest Hills Hosp. 10201 66th Rd*, 962 F. Supp. 2d 460, 470 (E.D.N.Y. 2013) (citing *Birkholz v. City of New York*, 10 Civ. 4719 (NGG), 2012 U.S. Dist. LEXIS 22445, at *14 (E.D.N.Y. Feb. 22, 2012)).  Back communicated to BHI through an attorney that she believed she had been constructively discharged, and instructed BHI to cease all direct communication, effectively resigning on that date.  *See* Doc. 20-1 at 2.

his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Id.* at 86.  Defendants dispute both points.  Doc. 19 at 9.

    *1.  Adverse Employment Action*

"An 'adverse employment action' is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).  "Examples of materially adverse changes include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Id.* (quoting *Galabya*, 202 F.3d at 640).

A constructive discharge may also constitute an adverse employment action. *Ramirez v. Temin & Co.*, 20 Civ. 6258 (ER), 2021 U.S. Dist. LEXIS 183760, at \*26 (S.D.N.Y. Sep. 24, 2021).  This occurs "when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Morris v. Schroder Capital Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007)).  The test is not "merely whether the employee's working conditions were difficult or unpleasant." *Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 12 (2d Cir. 2013) (internal quotation marks and citations omitted). Rather, "[w]orking conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000).  This is a "demanding standard, because 'constructive discharge cases present a wors[t] case harassment scenario, harassment ratcheted up to the breaking point.'" *Catania v. NYU Langone Health Sys.*, No. 22 Civ. 4362 (RA), 2022 U.S. Dist. LEXIS 220075, at \*8 (S.D.N.Y. Dec. 5, 2022) (quoting *Spires v. Metlife Grp., Inc.*, No. 18 Civ. 4464 (RA), 2019 U.S. Dist. LEXIS 160181, at \*26 (S.D.N.Y. Sept. 18, 2019)).

Back offers four grounds for her claim of constructive discharge as an adverse employment action: (1) Karni's negative performance review; (2) isolation from senior management and Karni's instruction that they reduce contact with her; (3) Andreadis's offer to consider a severance package or a transfer; and (4) Andreadis's order of a temporary transfer to compliance. Doc. 21 at 13. Defendants argue that none of these allegations are sufficient to support a claim of constructive discharge, and therefore Back's claim must be dismissed. Doc. 24 at 2–3.

None of the alleged adverse actions[6] by BHI or Karni rise to the level of a constructive discharge. See *Catania*, 2022 U.S. Dist. LEXIS 220075, at *8. Karni's treatment of Back does not rise to the level of such intolerability. *See Whidbee*, 223 F.3d at 73. "[I]ntolerability such that a reasonable person would [feel] compelled to resign" requires more than unfair criticism or treatment by a supervisor. *Catania*, 2022 U.S. Dist. LEXIS 220075, at *11–12 (citing *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993)). In *Catania*, a supervisor was alleged to have harassed the plaintiff by "ostracizing [her], belittling [her], and speaking to [her] in a passive-aggressive manner." *Id.* at *4. He would schedule one-on-one meetings for the sole purpose of "be[ing] scornful and belittling . . . merely to reprimand, mock, and be dismissive towards [her]." *Id.* at *4–5. Nevertheless, the court held that such treatment did not permit an inference of constructive discharge. *Id.* at *12. The sparse allegations about Karni's behavior simply say he became hostile shortly after Back filed her complaint, and he gave her negative feedback in a performance review.[7] Doc. 1 ¶¶ 82, 92. Allegations that he told

---

[6] Individual non-adverse employment actions cannot be combined in an effort to establish an adverse employment action. *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 356 n.22 (S.D.N.Y. 2006) ("[T]he Court is aware of [no law] that supports the proposition that the Court can consider the cumulative effect of *non-adverse* employment actions when evaluating an intentional discrimination claim.") (emphasis added); *cf. Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996) ("[T]he effect of a number of *adverse* conditions in the workplace is cumulative.") (emphasis added).

[7] The Court notes, moreover, that in that same performance review, Back was told that she would receive a 2% salary increase and a $15,000 bonus.

her "I don't get what you are doing at your station" and that she was "not doing her job" are similar to remarks alleged in *Catania*, 2022 U.S. Dist. LEXIS 220075, at *4. ("[Y]ou don't know what your role is.").  Indeed, more aggressive behavior from supervisors has been deemed insufficient to state a claim of constructive discharge. *See, e.g.*, *Martinez v. N.Y.C. Dep't of Educ.*, No. 04 Civ. 2728 (LTS), 2008 U.S. Dist. LEXIS 41454, at *40 (S.D.N.Y. May 27, 2008) ("[I]ncidents where [a supervisor] publicly yelled at [the plaintiff] for various reasons or called him 'shit' . . . constitute, as a matter of law, the sorts of petty slights and personality conflicts that are not actionable."); *Katz v. Beth Isr. Med. Ctr.*, No. 95 Civ. 7183 (AGS), 2001 U.S. Dist. LEXIS 29, at *42 (S.D.N.Y. Jan. 3, 2001) ("[a]n employee is not constructively discharged because she . . . receives unfair criticism, or is yelled at by supervisors."); *Zick v. Waterfront Comm'n of N.Y. Harbor*, No. 11 Civ. 5093 (CM), 2012 U.S. Dist. LEXIS 144920, at *5, *18–19 (S.D.N.Y. Oct. 4, 2012) (holding that an employee failed to state a claim for constructive discharge when her boss allegedly threatened to have her bar license removed; "threatened, berated, and questioned" her while she was working from home after an injury; and gave her the option of resigning by 9 a.m. the next day or being suspended).  Karni's alleged comments and hostile behavior are therefore insufficient to support a constructive discharge claim. *See Catania*, 2022 U.S. Dist. LEXIS 220075, at *8.

Back's allegations of isolation from other colleagues and senior management similarly do not rise above the "petty slights" that courts have determined are not actionable under Title VII.  *See Martinez*, 2008 U.S. Dist. LEXIS 41454, at *40.  Mere isolation in the workplace is insufficient to state a claim of constructive discharge. *See, e.g.*, *McWhite v. N.Y.C. Hous. Auth.*, No. 05 Civ. 0991 (NG), 2008 U.S. Dist. LEXIS 29145, at *32–33 (E.D.N.Y. Apr. 10, 2008) ("Plaintiff's claim that [her supervisor] alienated her from other employees by ordering them not to speak to her . . . does not constitute adverse employment action."); *Kaye v. Storm King Sch.*, No. 11 Civ. 3369 (VB), 2015 U.S. Dist. LEXIS 127508, at *36 (S.D.N.Y. June 8, 2015) (holding that

plaintiffs failed to state a claim for constructive discharge with allegations that they were "excluded from parties, and isolated from their colleagues"); *Dillon v. Morano*, 497 F.3d 247, 250, 254 (2d Cir. 2007) (holding that the plaintiff's exclusion from meetings he had previously attended with top staff was not an adverse employment action).  Back argues that the lack of contact prevented her from carrying out her duties as Karni's "main point of contact" with head executives.  Doc. 21 at 10.  A diminished workload, however, without a reduction in pay or formal demotion, is not an adverse employment action. *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 247–48 (S.D.N.Y. 2001) (holding that there was no adverse employment action when "[p]laintiff [did] not complain of any change in job responsibilities, he merely complain[ed] that his services were not utilized to their fullest capacity.").

Back's repeated insistence that Andreadis threatened her with termination is similarly unhelpful.  Doc. 21 at 13.  As an initial matter, the complaint does not include any allegations of an explicit threat.  Rather, the complaint states that Back met with Andreadis to express concerns about Karni's alleged change in behavior, and Andreadis offered either a transfer or a severance package as possible solutions.  Doc. 1 ¶¶ 96–98. The complaint does not allege that Back's continued employment was explicitly conditioned on accepting either proposition.  *See id.*  Threats of termination have, under certain circumstances, been deemed evidence of a constructive discharge, but even explicit threats are frequently dismissed as insufficient.  *See Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) (holding evidence of constructive discharge when a supervisor told an employee "he would be fired at the end of [a] . . . probationary period no matter what he did to improve his allegedly deficient performance"); *Valdes v. N.Y.C. Dep't of Env't. Prot.*, 95 Civ. 10407 (JSR), 1997 U.S. Dist. LEXIS 16625, at *11 (S.D.N.Y. Oct. 23, 1997) ("[A]n employer's clearly expressed desire that an employee resign has been held sufficient to find a constructive discharge"); *but see Katz*, 2001 U.S. Dist. LEXIS 29, at *36 (finding no constructive discharge where employee was

"routinely" berated by her supervisors, told to resign if dissatisfied, "and at least once threatened with termination"). This Court is aware of no precedent to support the contention that mere discussion of employment options, subjectively interpreted as an implied threat, constituted a constructive discharge. *See Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 270 (E.D.N.Y. 2012) ("[T]hreats of termination alone have occasionally been held" to show constructive discharge, but "those cases involved a direct and/or repeated threats from the employer, along with some other adverse conduct."). Back's subjective belief that Andreadis's suggestions were meant as a threat fall well short of this standard. *See id.*

Finally, Back argues that her temporary transfer to compliance for one week constituted a demotion. Doc. 21 at 13. She does not, however, offer any support for this conclusion beyond her own subjective belief that "any transfer away from" her current job would be unacceptable, and would be "perceived by her colleagues" as a demotion. Doc. 1 ¶ 99. In *Dowrich-Weeks*, the Second Circuit affirmed dismissal of a discrimination claim when the plaintiff offered "no facts supporting her conclusory assertion that she was 'demoted.'" 535 F. App'x 9, 12 (2d Cir. 2013). Such evidence could have included "her having received 'a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.'" *Id.* (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006)). Back's complaint offers no such evidence—it merely alleges that the temporary position was in "the compliance department," but includes no other information about the position. Doc. 1 ¶ 115. Back does not allege that it would have a less favorable salary, title, loss of benefits, responsibilities, or anything else beyond her personal belief that "any transfer" away from her current position would be a demotion. *Id.* ¶ 99. Without any support for the conclusory assertion that she would consider such a temporary transfer as a "demotion," Back again fails to allege that she

suffered a materially adverse employment action.  *See Dowrich-Weeks*, 535 F. App'x at 12.

In sum, Back has not alleged facts to support the claim that she was exposed to "working conditions so intolerable that [she was] forced into an involuntary resignation." *Ramirez*, 2021 U.S. Dist. LEXIS 183760, at *26.  Accordingly, her claim fails to adequately allege a constructive discharge, or any other adverse employment action, and her Title VII claim fails.

  *2.  Discriminatory Intent*

A plaintiff can show evidence of discriminatory intent either by alleging "direct evidence of intent to discriminate . . . or by indirectly showing circumstances giving rise to an inference of discrimination."  *Vega*, 801 F.3d at 87.  Indirect circumstances that give rise to an inference of discrimination may include "more favorable treatment of employees not in the protected group."  *Littlejohn*, 795 F.3d at 312 (citation omitted).  Other circumstances may include "bits and pieces of evidence" that work together to create a "mosaic" that supports an inference of intentional discrimination.  *Vega*, 801 F.3d at 87.

Back argues that discriminatory intent may be inferred because she was treated differently than the five male executives who also complained about Karni's behavior, and because of Defendants' "misogynistic behavior."  Doc. 21 at 14, 17.  Back first argues that any determination of whether certain employees are similarly situated is a question of fact for a jury, and therefore not suited to pre-discovery dismissal.  *Id.* at 13.  She also argues that the executives were similarly situated to Back because they also complained about Karni's behavior, were subject to the same whistleblower policy at BHI, and were therefore subject to the same workplace standards.  *Id.* at 15–16.  Finally, Back argues that allegedly misogynistic behavior by Karni and other BHI employees demonstrates an office culture of misogyny which supports an inference of discrimination.  *Id.* at 17–18.  Specifically, she claims that Karni would "scratch his

crotch" while standing near her, and would expect her to work on the Sabbath and other Jewish holidays while allowing Senior Vice Presidents to avoid such work.  *Id.*  She also references inappropriate behavior by various senior executives at unspecified times in the past.  *Id.* at 18.  Defendants respond that the comparators proffered by Back are not similarly situated because they had vastly different jobs, worked in different departments, for different supervisors, and had different titles, ranks, and responsibilities.  Doc. 19 at 12–13.  Defendants argue that the differences in their roles undermine any inference that sex was the sole reason for their differential treatment.  *Id.*  Defendants also argue that Back's allegations of a sexist culture are unrelated to the alleged adverse action in this case, and are too vague and conclusory to support sex discrimination claims.  *Id.* at 14.

  a. Back Fails to Show Disparate Treatment Because the Male Executives are not Similarly Situated

  A plaintiff seeking to show evidence for an inference of discriminatory intent by referencing disparate treatment of another employee "must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (quoting *Shumway v. UPS*, 118 F.3d 60, 64 (2d Cir. 1997)).  "What constitutes 'all material respects' . . . varies somewhat from case to case," but "must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness."  *Ramsaroop v. Dep't of Educ. of N.Y.*, No. 20 Civ. 4947 (ER), 2023 U.S. Dist. LEXIS 186, at *28 (S.D.N.Y. Jan. 2, 2023) (quoting *Graham*, 230 F.3d at 40).  Put another way, "[comparators] must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."  *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001).  "Whether two employees are similarly situated ordinarily presents a question of fact for the jury," *Graham*, 230 F.3d at 39, but "if there are many

distinguishing factors between plaintiff and the comparators, the court may conclude as a matter of law that they are not similarly situated," *Cooper v. Templeton*, 629 F. Supp. 3d 223, 231 (S.D.N.Y. 2022) (internal quotation marks and citations omitted).

The comparators proffered by Back cannot support a disparate treatment claim because numerous distinguishing factors show that they were not similarly situated. *See id.* Back was an executive assistant to Karni, while each of the male comparators were senior executives, none of whom were alleged to report directly and exclusively to Karni. Doc. 1 ¶ 67. These executives were not "similarly situated in terms of position, seniority, job responsibilities, business unit, performance, [or] length of experience," indicating that the roles they occupied were "vastly different on their face." *Cooper*, 629 F. Supp. 3d at 231; *see also Davis v. Metro N. Commuter R.R.*, No. 21 Civ. 387 (ER), 2023 U.S. Dist. LEXIS 106581, at *21 (S.D.N.Y. June 20, 2023) (finding that employees were not similarly situated when there was "no evidence that the employees had a similar job, responsibilities, seniority, or were under the same working conditions as [plaintiff]") (citing *DeJesus v. Starr Tech. Risks Agency, Inc.*, No. 03 Civ. 1298 (RJH), 2004 U.S. Dist. LEXIS 19213, at *29–32 (S.D.N.Y. Sept. 27, 2004)). The court in *Cooper* noted that there were a "wealth of cases in this circuit" demonstrating that "such similarities were found to be material . . . in cases concerning allegedly unequal discipline for similar misconduct." 629 F. Supp. 3d at 232 n.2. Back therefore does not share "sufficient employment characteristics" with the male executives to be considered "similarly situated." *Hornig v. Trs. of Colum. Univ.*, No. 17 Civ. 3602 (ER), 2022 U.S. Dist. LEXIS 60683, at *49 (S.D.N.Y. Mar. 31, 2022).

Furthermore, Back has not alleged that the proffered comparators were "engaged in comparable conduct." *Graham*, 230 F.3d at 40. Back argues that their conduct was the same because they all complained about Karni's behavior around the time of the holiday party, and disparate treatment was shown because they were penalized differently

in violation of BHI's whistleblower policy.[8]  Doc. 21 at 15–16.  While the whistleblower policy and its protections presumably apply equally to all whistleblowers, it is irrelevant to any comparison here because Back does not allege that *any* of the male executives filed a formal whistleblower complaint.  *Compare* Doc. 1 ¶ 71 ("Ms. Back submitted a formal complaint, in accordance with BHI's Whistleblower Policy . . . ."), *and* Doc. 1 ¶ 77 (BHI "does not permit retaliation against an employee, who, in good faith, has made a [whistleblower] Complaint."), *with* Doc. 1 ¶ 67 ("At least five male executives complained to HR or to Mr. Karni directly . . . .").  Employees treated differently for engaging in different conduct does not give rise to an inference of discrimination.  *See Moultrie v. NYS Dep't of Corr. & Cmty. Supervision*, No. 13 Civ. 5138 (NSR), 2015 U.S. Dist. LEXIS 60080, at *6–7 (S.D.N.Y. May 7, 2015) ("Less severe punishment for . . . qualitatively different misconduct does not raise an inference of discrimination.").

　　For the foregoing reasons, the five male executives are not similarly situated to Back, and therefore their disparate treatment cannot give rise to an inference of discriminatory intent.  *See Hornig*, 2022 U.S. Dist. LEXIS 60683, at *48–49.

　　b. Back's Sparse Allegations of a Misogynistic Culture do not Support an Inference of Discrimination

　　To support an inference of discrimination, a plaintiff must show that the alleged adverse action "was motivated at least in part by Defendants' discriminatory intent." *Pompey-Primus v. Success Acad. Charter Sch., Inc.*, No. 21 Civ. 3981 (KPF), 2022 U.S. Dist. LEXIS 29313, at *15 (S.D.N.Y. Feb. 17, 2022).  "Because discrimination claims implicate an employer's usually unstated intent and state of mind, rarely is there direct, smoking gun, evidence of discrimination.  Instead, plaintiffs usually must rely on bits and pieces of information to support an inference of discrimination, i.e., a mosaic of

---

[8] Employees in different jobs, with different supervisors, have at times been deemed "similarly situated" in terms of their obligation to follow specific workplace policies, *see, e.g.*, *Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 184 (E.D.N.Y. 2013) (finding that a registered nurse and an MRI technician, with different supervisors, were similarly situated with respect to a sexual harassment policy), but neither Back nor the executives in question are alleged to have violated any such company-wide policy.

intentional discrimination." *Vega*, 801 F.3d at 86.  Facts may be useful to "indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* at 87.

Back tries to apply the "mosaic" approach outlined in *Vega* to the allegedly misogynistic behavior she had encountered at BHI, pointing to past harassment by other employees and Karni's "boorish" behavior.[9]  *See* Doc. 21 at 17–18.  Her argument fails because she "has not shown that [the allegedly adverse employment action was] taken because of her sex."  *Hornig*, 2022 U.S. Dist. LEXIS 60683, at *48; *see also Shankar v. Ankura Consulting Grp., LLC*, No. 20 Civ. 07463 (ALC), 2021 U.S. Dist. LEXIS 151098, at *15–18 (S.D.N.Y. Aug. 11, 2021) (dismissing a discrimination complaint that lacked allegations connecting the plaintiff's race to her termination); *cf. Vega*, 801 F.3d at 88 (finding a plausible discrimination claim when the plaintiff alleged that the adverse action was taken "because of" his ethnicity).[10]  There is simply no relation between the alleged behavior of unnamed executives and Karni's alleged discriminatory response to Back's whistleblower complaint.  *See* Doc. 1. ¶ 40.  Back's allegations about Karni's personal behavior are similarly unrelated.  Back alleges that Karni would "scratch his crotch" while standing near her, and order her to set his office desk for lunch.  Doc. 1 ¶ 38.  Back does not allege that he engaged in either of those behaviors *because* of her sex, nor does he relate either of those behaviors to his alleged reaction to her complaint.  Without a causal connection, Karni's past behavior does not plausibly support the inference that he behaved with discriminatory intent.  *See Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007) ("The *sine qua non* of a gender-based discriminatory action claim

---

[9] For the same reasons previously discussed, Back's argument that disparate treatment is evidence of a misogynistic culture fails because she was not "similarly situated" to the male executives at BHI.  *See Hornig*, 2022 U.S. Dist. LEXIS 60683, at *48–49.

[10] Back points to *Dotson v. City of Syracuse* to support the argument that evidence of a misogynistic culture may be relevant to a discrimination claim.  No. 11 Civ. 620 (BKS), 2019 U.S. Dist. LEXIS 205709, at *5 (N.D.N.Y. Nov. 27, 2019) ("[B]ackground evidence regarding gender discrimination by Defendants may be relevant to Plaintiff's claim.").  However, this is only true when that background evidence has some relation to the claim at issue.  *Id.* at *5–6 ("The relevance of this sort of evidence depends on the degree of overlap with Plaintiff's claim, such as the same time period, the same Defendants, etc.").

under Title VII is that 'the discrimination must be *because of* sex.'") (emphasis in original) (quoting *Leibovitz v. N.Y.C Transit Auth.*, 252 F.3d 179, 189 (2d Cir. 2001)); *see also Pompey-Primus*, 2022 U.S. Dist. LEXIS 29313, at *17 ("[A]bsent additional detail linking [Defendant's conduct] to Plaintiff's sex, it does not plausibly suggest a discriminatory motive.").

For the foregoing reasons, Back's complaint lacks allegations that plausibly lead to an inference of discriminatory intent by BHI or Karni.  *See Brown*, 673 F.3d at 150. Because the allegations are insufficient Back has failed to establish a prima facie case of sex discrimination, and Defendants' motion to dismiss the Title VII claim is granted.

### B.  State and City Law Claims

In addition to her Title VII claim, Back alleges state and local law claims for violations of the New York State Human Rights Law, New York City Human Rights Law, and New York Labor Law.  Pursuant to 28 U.S.C. § 1367(c)(3), if the Court has dismissed all of the claims over which it has original jurisdiction, it may decline to exercise jurisdiction over any non-federal claims over which it could have exercised supplemental jurisdiction.  28 U.S.C. § 1367(c)(3).

Subject matter jurisdiction in the instant action is based on federal question jurisdiction.  28 U.S.C. § 1331.  Because no federal claims remain that are subject to a merits determination by this Court, it would be inappropriate to adjudicate Back's state and city law claims.  *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *McGugan v. Aldana-Bernier*, No. 11 Civ. 00342 (TLM), 2012 U.S. Dist. LEXIS 60340, at *21 (E.D.N.Y. Apr. 30, 2012) *aff'd*, 752 F.3d 224 (2d Cir. 2014) ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice.") (citations omitted).  Therefore, all

non-federal claims contained in Back's complaint are hereby dismissed without prejudice.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 18, and to close the case.

It is SO ORDERED.

Dated:    March 21, 2024
          New York, New York

_____
        EDGARDO RAMOS, U.S.D.J.

20